IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF WYOMING

FILED

2:39 pm, 4/20/12

Tim J. Ellis
Clerk of Court

| | |
|---|---|
| In re ) | |
| ) | |
| BETH A. MILLER, ) | Case No. 10-21250 |
| ) | Chapter 7 |
| Debtor. ) | |
| ) | |
| OREGON TRAIL BANK OF GUERNSEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No. 11-2001 |
| ) | |
| BETH A. MILLER, ) | |
| ) | |
| Defendant. ) | |

**OPINION ON COMPLAINT**

On March 28, 2012, this matter came before the court for trial on the Complaint for Nondischargeability of Debt Owing to Oregon Trail Bank filed by Oregon Trail Bank ("Bank") and the Answer filed by Beth A. Miller ("Miller"). At the conclusion of the trial, the court took the matter under advisement. The court having reviewed the record, testimony, evidence and applicable law concludes judgment shall be entered for the Defendant and against the Plaintiff.

**Jurisdiction**

The court has jurisdiction over this adversary complaint pursuant to 28 U.S.C. §§ 157(a) and 1334(a). This is a core proceeding under § 157(b)(2)(I). The complaint is brought pursuant to 11 U.S.C. § 523(a)(2)(A) and (B).[1]

---

[1] Unless otherwise indicated, all future statutory references are to the Bankruptcy Code, Title 11 of the United States Code.

**Findings of Facts**

The following facts are uncontroverted and were established by admissions in the pleadings or by stipulation of counsel:

(a) The Bank is a banking organization chartered under the laws of the State of Wyoming with its principal office located in Guernsey, Wyoming and a banking office located in Cheyenne, Wyoming and is authorized to do business in Wyoming. The Bank is a creditor in Miller's Chapter 7 bankruptcy case.

(b) Ms. Miller is an individual residing in Cheyenne, Wyoming and the debtor in this adversary case.

(c) On or about April 7, 2009, Miller and her ex-husband submitted a written loan application to the Bank for the purpose of requesting that the Bank extend credit to them to refinance and complete construction on a home located at 1994 Telephone Road, Cheyenne, Wyoming ("Telephone Road Home").

(d) The loan application listed the borrowers' income, housing debt service, expenses, assets and liabilities.

(e) At her § 341 creditors' meeting, Miller disclosed that upon the sale of her previous home, she remitted more than $75,000.00 to her mother to repay loans from her mom that had been advanced over a period of years.

(f) After the § 341 creditors' meeting, Miller amended her Statement of Financial Affairs in the bankruptcy case to disclose the transfer of $75,000.00+ to her mother on September 3, 2009 to satisfy that antecedent debt. Ms. Miller gave a sworn statement that describes that her mother made loans to her over a period of years.

(g) Ms. Miller transferred the proceeds from the sale of her previous home into an account held jointly with her daughter to prevent her ex-husband from obtaining any of that money in their divorce.

(h) Ms. Miller listed on her Schedule D, that she owes the Bank $275,352.14, as an undisputed claim.

(i) The Bank obtained a judgment against Miller in the amount of $269,520.74 plus pre-and post-judgment interest due to her failure to pay the Bank's loan to her and her ex-husband.

(j)     The Bank filed a proof of claim in this case in the amount of $276,391.83 which includes the judgment amount plus pre-judgment interest to the date of the judgment and post-judgment interest to the date that Miller filed her Chapter 7 bankruptcy petition.

(k)     Ms. Miller stipulates to the fact that she did not disclose on her credit/loan application, debts to: (1) Toyota; (2) Home Depot; (3) HSBC; and, (4) her mother.

The court finds the following additional facts:

Ms. Miller was living at her house located on Silvergate Drive in Cheyenne, Wyoming ("Silvergate House"), when she married Gary Hoblyn ("Hoblyn"). Mr. Hoblyn owned and lived at the Telephone Road Home. After marrying, Ms. Miller continued to live at the Silvergate House. The couple approached the Bank in April 2009, for a loan to refinance the existing debt on the Telephone Road Home and for funds to complete its construction. It is uncontroverted that Miller did not list the debt that she owed to her mother on the loan application.

Craig Kerrigan, president of the Bank, worked with Miller and Hoblyn, following the Bank's standard procedures for considering a loan application. He testified that, in addition to the loan application, the Bank obtained a credit report on Miller, verified her employment, and calculated the debt to income ratio to determine the amount the Bank would be comfortable loaning to Miller and Hoblyn. Also as part of its standard procedures, the Bank had a title search and appraisal completed on the property. Miller's credit report did not reflect the debt to her mother.

Mr. Kerrigan testified that Miller stated at the initial meeting that part of the proceeds from the sale of her Silvergate House would be applied to the pay down the

construction loan. Darin Duncan, a loan officer with the Bank, and Kerrigan each testified that Miller stated, at the closing, that the proceeds from the sale of her Silvergate House would be used to pay-down her personal debt and applied to the construction loan. Each admitted that Miller never stated the amount of personal debt or specific amount that was going to be applied to the construction loan.

Mr. Kerrigan admitted that the Bank did not take a lien on the Silvergate House, did not add any conditions to the mortgage that Miller and Hoblyn executed, nor ask Miller to sign a promissory note regarding the proceeds from the sale of the Silvergate House to insure that the Bank's interests were protected. It was his understanding that Miller's Silvergate House was under contract and he did not want to "mess up the title for the pending sale." He testified that at the time the transaction was being completed he "relied on their verbal words" that part of the proceeds would be applied to the construction loan.

Ms. Miller testified that at the closing, "it was mentioned," by Hoblyn and the bank personnel that the proceeds from the sale of her Silvergate House were to be applied to the construction loan. However, Ms. Miller denied that she committed a sum certain of the proceeds to be paid to the Bank.

Ms. Miller testified that shortly after closing on the construction loan with the Bank in June 2009, she moved to Hoblyn's Telephone Road Home. She lived there for eleven days, then events occurred between Hoblyn and Miller that required her to get a restraining order and subsequently move out. She was locked out of the house and moved in with her mother.

Ms. Miller testified that upon receiving the proceeds from the sale of the Silvergate House, she placed the proceeds in her bank account. Thereafter, she moved the funds to an account with her daughter so Hoblyn "could not get to the money." Ms. Miller testified that, as she had been locked out of the Telephone Road Home, she used the funds to pay back the debt to her mother, rather that use the funds to pay on the construction loan on Hoblyn's house. According to Miller's testimony, her mother used the funds as a down payment on a house, which Miller now rents.[2]

The Bank pursued its remedies against Miller in the District Court for the First Judicial District, Laramie County, Wyoming. That court entered a Final Judgment on September 24, 2010, pursuant to an Order Granting Oregon Trail Bank's Motion for Summary Judgment. The Bank was granted a judgment against Miller in the amount of $269,520.74, plus $42.17 in accrued interest for each day after May 12, 2010 until the entry of the Final Judgment. Additionally the court awarded post-judgment interest at the rate annual rate of 6.25%.

**Discussion**

The Bank asserts that its claim should be excepted from discharge pursuant to § 523(a)(2)(A) and (B). Ms. Miller argues that any inaccuracies that may have existed were as a result of a mistake or inadvertence.

---

[2] Miller and Hoblyn divorced in November 2009. In a subsequent property settlement agreement, Hoblyn was granted the Telephone Road Home. He filed for Chapter 11 bankruptcy protection on November 13, 2009. Oregon Trail Bank moved for and was granted relief from stay on April 9, 2012 from this court, to pursue its state court remedies to foreclose on the Telephone Road Home.

Page 5

Sections 523(a)(2) (A) and (B), state:

"A discharge under section 727...of this title does not discharge an individual debtor from any debt –
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by-
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
(B) use of a statement in writing –
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, service, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive..."

Section 523(a)(2)(A)

Exceptions to discharge are to be narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor.[3] A creditor has the burden of proof under § 523(a) by a preponderance of the evidence.[4] Once a creditor establishes the acts complained of, the debtor must then come forward with a credible explanation of his actions.[5]

The elements of § 523(a)(2)(A) are: the debtor made a false representation; with the intent to deceive the creditor; the creditor relied on the false representation; and the

---

[3] *Cobra Well Testers v. Carlson (In re Carlson)*, BAP no. WY-06-027, 2006 Bankr. LEXIS 3114 (10th Cir. BAP, Nov. 22, 2006).

[4] *Grogen v. Garner*, 111 S. Ct. 654, 659 (1991).

[5] *In re Martin*, 88 B.R. 319, 321 (D. Colo. 1988).

Page 6

conduct resulted in damage to the plaintiff.[6] False representations are representations knowingly and fraudulently made that give rise to the debt. False pretenses, as distinguished from false representations, involve an implied misrepresentation that is meant to create and foster a false impression.[7]

The standard for excepting a debt from discharge as a fraudulent representation within the meaning of § 523(a)(2)(A) is one of justifiable reliance on the representation.[8] To satisfy the criteria for nondischargeability, the false representation must have been made with the intent to deceive. Intent to deceive may be inferred from the totality of the circumstances. In determining whether a creditor's reliance was justifiable, a court should examine the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than apply a community standards of conduct to all cases. Unless a creditor can show that a debtor obtained a loan while never intending to repay it, an implied representation regarding an intent to repay is not fraudulent within the meaning of § 523(a)(2)(A). Ability to pay is relevant to the determination of whether the debtor never intended to repay the debt.[9] Even under the "justifiably" test, the plaintiff must use his senses and at least make a cursory examination or investigation of the facts of the transaction before entering into it.[10]

---

[6] *In re Young*, 91 F.3d 1367, 1373 (10th Cir. 1996).

[7] *In re Valdez*, Case No. 7-04-15876, 2007 Bankr. LEXIS 1398 (Bankr. D. N.M., April 17, 2007).

[8] *Field v. Mans*, 516 U.S. 59 (1995).

[9] *Valdez* at 11, citing *Chevy Chase Bank FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 786 (10th Cir. BAP 1998).

[10] *Johnson v. Riebesell*, 586 F.3d 782 (10th Cir. 2009).

The determinative issue when a plaintiff seeks to except debt from discharge under § 523(a)(2)(A) is Defendant's intent at the time the Plaintiff advanced the funds. If funds are deemed to have been entrusted to the debtor for a specific purpose, the debtor is regarded as impliedly representing his intention to use the funds accordingly. Failure to use the funds would be evidence of a misrepresentation of that intent.[11]

Failure to disclose information constitutes a false representation or false pretense under § 523(a)(2)A) if the elements are proven by a preponderance of the evidence.[12] When determining intent, the court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations.[13]

The court, in reviewing the totality of the circumstances, finds that, at the time the loan transaction was occurring between the Bank and Miller, she and Hoblyn were in a state of marital bliss, intending to sell her house and fix-up his so that both of them could live at the Telephone Road Home. The court finds that testimony of the Bank's officers was credible. Miller represented to the Bank that an undisclosed amount of proceeds from the sale of her Silvergate House would be applied to the construction loan at the Bank. Kerrigan testified that knowing that those proceeds were available was one of the

---

[11] *In re Segala*, 133 B.R. 261, 264 (Ba kr. D. Mass. 1991).

[12] *Fowler Brothers v. Young*, 91 F.3d 1367 (10th Cir. 1996).

[13] *In re Davis*, 246 B.R. 646 (th Cir. BAP 200) (Affirmed in part, vacated and remanded in part on other grounds, 2002 WL 10044832 unpublished opinion).

Page 8

criteria that the Bank used to approve the loan and determine the amount of funds to loan Miller and Hoblyn. The Bank relied upon these representations and loaned the funds.

However, the court also finds that Miller's representations were not made with the intent to deceive. She believed that the events would transpire as were disclosed to the Bank. The statements were not false pretenses, as again, at the time of the transaction, Miller did not intend to create or foster a false impression that the proceeds from the sale of her house would not be used to pay toward the construction loan debt. It appears that the circumstances changed after the marriage began to dissolve. Miller testified that after the dramatic events that resulted in her removal from the Telephone Road Home, she decided to not contribute the sale proceeds from her house to the construction loan on Hoblyn's house.

The elements of a fraud claim under Wyoming law are a false representation made by the defendant which is relied upon by the plaintiff to his damage, the asserted false representation must be made to induce action; and the plaintiff must reasonably believe the representation to be true.[14] Again, the court does not find that Miller's statements at the time of the loan transaction regarding the proceeds were false representations.

The Bank, has failed to carry its burden to prove that there were false pretenses, false representations, actual fraud, or that Miller had the requisite intent while making the statements at the time of the transaction under §523(a)(2)(A).

---

[14] *Lavoie v. Safecare Health Serv.*, 840 P.2d 239 ( 1992); *Duffy v. Brown*, 708 P.2d 433, 437 (Wyo. 1985)

Section 523(a)(2)(B)

The Bank contends that Miller's failure to disclose the debt to her mother, and the Bank's reliance on the misinformation of the loan application is grounds to deny Miller's discharge of the Bank's debt. The loan application was represented as a reflection of Miller's and Hoblyn's financial condition. The Bank relied upon the information as part of the criteria that it used to approve the construction loan.

The elements necessary to a determination of non-dischargeability based on a writing that contains false statements regarding the debtor's finances are enumerated in § 523(a)(2)(B). The requirement that a statement regarding the debtor's financial statement be "in writing" is a separate threshold element.[15] If a statement of financial condition is made, it may be false and made with intent to deceive, but if it is not made in writing, then it does not give rise to a claim of nondischargeability. A "statement of financial condition," is narrowly defined to be a statement of a debtor's net worth, overall financial health, or ability to generate income. This strictly construes § 523(a)(2)(B) against the creditor and liberally in favor of the debtor.[16]

Unlike § 523(a)(2)(A) which requires only justifiable reliance, § 523(a)(2)(B) requires the higher standard of reasonable reliance and is measured by an objective standard.[17] The standard of reasonableness places a measure of responsibility upon a

---

[15] *Valdez* at 13, citing *Belco First Federal Credit Union v. Kasper (In re Kaspar)*, 200 B.R. 399, 402 (D.Colo. 1996), aff'd 125 F.3d 1358 (10th Cir. 1997).

[16] *In re Joelson*, 307 B.R. 689 (10th Cir. BAP 2004)

[17] *Valdez* at 13, citing *In re Merrick*, 347 B.R. 182, 189 (Bankr.M.D.La. 2006) {noting that reasonable reliance is a more exacting standard than justifiable reliance, and focuses on whether the creditor's reliance would

creditor to ensure that there exists some basis for relying on a debtor's representations. Reliance on a false financial statement was not unreasonable where the financial statements on their face do not reveal any inconsistencies or omissions and the debtor was introduced to the bank by the bank's known customer.[18]

The court finds that the threshold element that the statement be in writing has been met. Ms. Miller and Hoblyn provided the Bank with a loan application, which they executed, listing their assets and debts. The Bank also meets the standard of reasonable reliance as it further investigated Ms. Miller's financial situation by obtaining a credit report and verifying her employment.

Ms. Miller testified that although she signed the loan application, Hoblyn completed the form. There was not any testimony as to where the information on the loan application was obtained regarding the debts that were listed and more particularly those not listed. It is unknown to the court, if Miller provided Hoblyn the information or if Hoblyn completed the form on his own.

The court does not find that Miller "caused to be made or published with intent to deceive," the information on the loan application. Again, at the time that the loan application was provided and during the loan transaction, the court finds Miller's intent was to use the proceeds from the sale of her Silvergate House to pay toward the balance of the construction loan. It was not until after the dramatic events occurred in the

---

have been reasonable to a hypothetical average person..)

[18] *In re Watson*, 958 F.2d 977 (10th Cir. 1992).

personal lives of Miller and Hoblyn that she used the funds from the sale of her house to pay the personal debt to her mother. The court finds that the Bank failed to carry its burden that Miller caused the loan application to be made with any intent to deceive.

The court finding that the Bank has failed to carry its burden pursuant to §§ 523(a)(2)(A) and (B) finds for Miller and against the Bank.

In conclusion, the court finds for the defendant, Beth A. Miller and against the plaintiff, Oregon Trial Bank on all allegations of the complaint.

This opinion constitutes the Court's findings of fact and conclusions of law. A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

DATED this ___ day of April, 2012

By the Court

HONORABLE PETER J. MCNIFF
United States Bankruptcy Judge

Service to:
James R. Belcher
Mitchell E. Osborn